UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                          )<br>)<br>JARMINA KALLON,                   )<br>    Defendant                        ) | Cr. No. 20-10136-16 |

## SENTENCING MEMORANDUM OF THE UNITED STATES

On October 22, 2020, the defendant, JARMINA KALLON, pled guilty to the Indictment, which charged him with Conspiracy to Distribute and Possess with Intent to Distribute Cocaine and Cocaine Base, in violation of 21 U.S.C. § 846 (Count One). The defendant's sentencing hearing is scheduled for February 26, 2021. For the reasons presented herein, in the PSR, and to be presented at the sentencing hearing, the government requests principally a sentence of 24 months' imprisonment, which is at the low end of the advisory guidelines range.

## I. BACKGROUND AND THE OFFENSE

This case arose from a joint investigation by the Drug Enforcement Administration and Boston Police Department into Kenji DRAYTON, the leader of a drug trafficking organization within the Greater Boston area. Presentence Investigation Report ("PSR") ¶ 8. During the investigation, law enforcement identified Jarmina KALLON as a "wholesale" purchaser of cocaine from K. DRAYTON and is responsible for at least 300, but not more than 400, grams of cocaine.[1] PSR ¶¶ 10, 34.

---

[1] There was a possibility that KALLON could have been held accountable for passing the threshold of 400 grams of cocaine. However, because the amounts in this matter are estimates, "the Probation Office has conservatively held the defendant accountable for under 400 grams of cocaine." However, this may change upon the certification of the seized drugs.

K. DRAYTON and KALLON met three times for drug transactions, each at K. DRAYTON's home, on April 1, April 8, and April 18 of 2020. PSR ¶ 13, 19, 23. In each instance, KALLON provided K. DRAYTON with funds for 62 grams of cocaine. PSR ¶ 20, 34.

On April 1, 2020, at 11:28 a.m., K. DRAYTON telephoned KALLON. PSR ¶ 13. K. DRAYTON was inquiring as to whether KALLON would stop by K. DRAYTON's home at 519 Harrison Avenue in Boston, MA. PSR ¶ 13. KALLON told K. DRAYTON that he needed to first go to Mattapan to pick up some money before visiting K. DRAYTON. PSR ¶ 13. Seventy minutes later, at 12:38 p.m., KALLON arrived at K. DRAYTON's home in his girlfriend's white 2015 Acura ILX ("white Acura"), telephoned K. DRAYTON, and asked to be let in. PSR ¶ 15-16. Shortly thereafter, KALLON entered K. DRAYTON's home. Nine minutes later, at 12:47 p.m., KALLON exited K. DRAYTON's home and began driving home in the white Acura. PSR ¶ 16. At 1:13 p.m., KALLON returned to his girlfriend's residence at 45 Highland Avenue, Apartment 12, in Randolph, MA. PSR ¶ 17.

On April 8, 2020, KALLON telephoned K. DRAYTON at 11:05 a.m. PSR ¶ 19. KALLON inquired as to whether he "could grab something from [K. DRAYTON] real quick for somebody." PSR ¶ 19. More specifically, KALLON "need[ed] a Doob."[2] PSR ¶ 19. K. DRAYTON agreed, and KALLON confirmed that as soon as he obtained the necessary funds, he was going to "come and get it from [K. DRAYTON]." PSR ¶ 19.

At 8:00 p.m. later that evening, KALLON and K. DRAYTON began coordinating this next meeting. PSR ¶ 21-22. KALLON left 45 Highland Avenue at 9:42 p.m., and began driving to K. DRAYTON's home. PSR ¶ 21. KALLON arrived at 519 Harrison avenue at 10:17 p.m., and went

---

[2] 'Doob' is drug code for 62 grams of cocaine." PSR ¶ 20. As such, KALLON was inquiring as to whether K. DRAYTON could provide him with 62 grams of cocaine to distribute to at least one other person.

2

into K. DRAYTON's home. PSR ¶ 22. "After a short stay of less than five minutes, surveillance saw KALLON leave 519 Harrison Avenue, re-enter the white Acura, and drive away." PSR ¶ 22. KALLON arrived back at his girlfriend's residence at 10:39 p.m. PSR ¶ 22.

Ten days later, on April 18, 2020, K. DRAYTON telephoned KALLON at 4:53 p.m. PSR ¶ 23. K. DRAYTON inquired as to when KALLON would be coming by, to which KALLON replied: "I'll come there right now." PSR ¶ 23. Nearly one-half hour later, KALLON and his girlfriend left the 45 Highland Avenue apartment and began driving the white Acura in the direction of K. DRAYTON's home. PSR ¶ 24. Not too long after 5:30 p.m., KALLON arrived at 519 Harrison Avenue in the white Acura and went into the residence. PSR ¶ 26. After spending a few minutes in K. DRAYTON's home, KALLON left and began driving away. PSR ¶ 26.

As KALLON began to head back to 45 Highland Avenue, surveillance closely followed. PSR ¶ 26. Once the car was on Mazzeo Drive, Randolph Police officers conducted a motor vehicle stop on the Acura based on the information received from this investigation, and the fact that the vehicle had a defective taillight. PSR ¶ 26. After stopping the white Acura, Randolph Police officers asked KALLON and his girlfriend to step out of the car. PSR ¶ 27. The police then performed a pat-down frisk on KALLON. PSR ¶ 27. Upon the police feeling an object in his waistband, KALLON began to flee the scene. PSR ¶ 27. KALLON was successfully apprehended after a short foot chase. PSR ¶ 27. KALLON was then found to be in possession of a plastic baggie containing a white powdery substance. PSR ¶ 27. The contents of the plastic bag were tested. PSR ¶ 27. It tested positive for cocaine and had an estimated weight of 62 grams. PSR ¶ 27.

As part of the takedown, law enforcement executed a search warrant for 45 Highland Avenue, Apartment 12, in Randolph, MA. PSR ¶ 28. That search warrant was executed on June

24, 2020. PSR ¶ 28. While searching the residence, officers found, among other things, approximately 219 grams of cocaine. PSR ¶ 28.

## II. GUIDELINES ANALYSIS AND CRIMINAL HISTORY

The PSR found that KALLON is base level 20 pursuant to USSG § 2D1.1. The Probation Office arrived at this calculation after making conservative estimates regarding the quantities of drugs purchased from K. DRAYTON and amount seized from KALLON's girlfriend's home. PSR ¶ 34. More specifically, the Probation Office asserted that KALLON purchased 62 grams of cocaine on April 1, April 8, and April 18, 2020,[3] totaling 186 grams. PSR ¶ 34. The 186 grams purchased by KALLON was then added to the 219 grams of cocaine recovered when law enforcement executed the search warrant on June 24, 2020, now totaling 405 grams of cocaine. PSR ¶ 34. KALLON therefore, theoretically, passes "over the threshold of 400 grams (for a base offense level of 22)." PSR ¶ 34. However, given that transactions on April 1 and April 8 were only estimates, "the Probation Office has conservatively held [KALLON] accountable for under 400 grams of cocaine. Therefore, the base offense level is 20 (at least 300 grams, but not more than 400 grams of cocaine)." PSR ¶ 34. The government does not contest this finding for the purpose of this hearing. KALLON's offense level is reduced by three for acceptance of responsibility. PSR ¶ 41-43.

Although defendant was arrested on three prior occasions, he has no scorable convictions and is therefore Criminal History Category I. PSR ¶¶ 48- 54. At Total Offense Level 17 and Criminal History Category I, KALLON's Guidelines Sentencing Range is 24 to 30 months.

---

[3] It is true that the calls on April 1 do not specifically reference the amount. However, it reasonable to assume that the amount in question would be 62 grams, since that is how much KALLON requested on April 8, and how much he received on April 18.

### III.  18 U.S.C. §3553(a) FACTORS

Consideration of the §3553(a) factors demonstrates a sentence of 24 months is the appropriate sentence in this case.  Foremost among those factors is the nature of this offense, trafficking in cocaine.

#### A.      The Nature of the Offense

Authorities at the federal, state, and local levels have expended great resources in response to the opiate epidemic, which remains a terrible threat.  Perhaps as a result, less has been said about cocaine.  While of certainly less dangerous than opiates such as fentanyl, cocaine remains a significant danger not only to the residents of Massachusetts, but the country writ large—perhaps a greater risk now, in fact, than in past years.  It is worth revisiting why that is the case.  "Cocaine is a powerfully addictive stimulant drug."[4]  It affects the brain's "reward pathway" by allowing more dopamine to be absorbed by dopamine receptors in the brain.  More specifically, cocaine binds to dopamine transporters, preventing the recycle of dopamine back into the transmitting neuron.[5]  As a result, there is significantly more dopamine in the synapses, which leads to "dopamine buildup in the synapse."[6]  The dopamine receptors are then forced to uptake the additional dopamine, "which contributes to the pleasurable effects of cocaine."[7]  In this sense, "[s]mall amounts of cocaine usually make the user feel euphoric, energetic, talkative, mentally

---

[4] *Cocaine Research Report: What is cocaine?*, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/cocaine/what-cocaine (last visited Feb. 19, 2021).

[5] *Cocaine Research Report: How does cocaine produce its effects?*, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/cocaine/how-does-cocaine-produce-its-effects (last visited Feb. 19, 2021).

[6] *Id.*

[7] *Id.*

alert, and hypersensitive to sight, sound, and touch," with some individuals reporting increased physical and intellectual efficiency, and others indicating an opposite effect.[8]

Such usage results in long term degeneration of the brain. "[T]he brain starts to adapt so that the reward pathway becomes less sensitive to natural reinforcers."[9] As the brain continues to adapt to the increased dopamine in one's system, tolerance begins to develop where "higher doses, more frequent use of cocaine, or both are needed to produce the same level of pleasure and relief from withdrawal experienced initially."[10] Therefore, "[t]olerance to cocaine reward and sensitization to cocaine toxicity can increase the risk of overdose in a regular user."[11]

Cocaine usage may induce serious physiological complications immediately or shortly after use. "Some of the most frequent are cardiovascular effects, including disturbances in heart rhythm and heart attacks; neurological effects, including headaches, seizures, strokes, and coma; and gastrointestinal complications, including abdominal pain and nausea. . . . Cocaine-related deaths are often a result of cardiac arrest or seizures."[12] These effects are particularly dangerous

---

[8] *Cocaine Research Report: What are the short-term effects of cocaine use?*, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-short-term-effects-cocaine-use (last visited Feb. 19, 2021).

[9] *Cocaine Research Report: What are the long-term effects of cocaine use?*, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-long-term-effects-cocaine-use (last visited Feb. 19, 2021).

[10] *Id.*

[11] *Id.*

[12] *Cocaine Research Report: What are the short-term effects of cocaine use?*, NATIONAL INSTITUTE ON DRUG ABUSE, https://www.drugabuse.gov/publications/research-reports/cocaine/what-are-short-term-effects-cocaine-use (last visited Feb. 19, 2021).

when combined with other depressants such as alcohol or heroin.  Each can be toxic or induce overdose, given the offsetting nature of combining a stimulant with a depressant.[13]

The high potentiality of cocaine overdoses is not merely theoretical, it represents a reality that is plaguing this country.[14]  Between the years 2009 and 2013, overdoses involving cocaine were relatively stable.[15]  However, cocaine overdoses nearly tripled between 2013 and 2018.[16]  This represents a 27 percent year over year increase in cocaine overdoses.[17]  "In 2018 [alone], there were 14,666 drug overdose deaths involving cocaine in the United States for an age-adjusted rate of 4.5 per 100,000 standard population."[18]  Moreover, "rates increased between 2009 and 2018 for all age groups."[19]

---

[13] *Id.*

[14] The CDC has not yet published related information from the 2019 or 2020. Thus, in the data that follows, 2018 represents the most recent data available.

[15] Holly Hedegaard, et al., *Increase in Drug Overdose Deaths Involving Cocaine: United States, 2009–2018*, CENTERS FOR DISEASE CONTROL AND PREVENTION NCHS DATA BRIEF NO. 384, 1, 1 (Oct. 2020), https://www.cdc.gov/nchs/data/databriefs/db384-H.pdf.

[16] *Id.* at 1.

[17] *Id.* at 1.

[18] *Id.* at 1.

[19] *Id.* at 2.



Perhaps most crucially, cocaine is often combined with opioids. This is significantly more deadly than cocaine without opioid involvement. As alluded earlier, the combination of a stimulant with a depressant dramatically increases the potentiality of overdose.[20] Because the effects of cocaine are offset by the sedation of an opioid such as heroin, one may end up taking a higher dosage of the opioid without realizing it, inevitably leading to overdose.[21] Furthermore, "because cocaine's effects wear off sooner, this can lead to a heroin overdose, in which the user's respiration dangerously slows down or stops, possibly fatally."[22]

Analogous to the tripling of cocaine related overdoses during the relevant period of 2013 through 2018, "drug overdose deaths involving cocaine with concurrent involvement of opioids,

---

[20] *See supra* note 8.
[21] *See supra* note 8.
[22] *Supra* note 8.

the rate remained stable from 2009 through 2013 ranging from 0.7 to 0.9 per 100,000."[23] However, this rate *more than tripled* to 3.4 deaths per 100,000 in 2018.[24] Given the opioid epidemic affecting the Commonwealth and the country writ large, this dramatic increase in deaths is particularly troubling, as it demonstrates the large number of people that may be at risk.

Even not counting opioid usage, which is difficult considering its ubiquity among substance abusers, deaths from cocaine alone (i.e. independent of opioid involvement) are also on the rise. Once again, deaths involving cocaine with no opioid remained constant throughout the period of 2009 through 2014. Since 2014, deaths have nearly doubled, increasing to 1.1 per 100,000 in 2018.[25]



Figure 4. Age-adjusted rates of drug overdose deaths involving cocaine, by concurrent involvement of opioids: United States, 2009–2018

---

[23] Hedegaard, et al., *supra* note 15, at 4.
[24] Hedegaard, et al., *supra* note 15, at 4.
[25] Hedegaard, et al., *supra* note 15, at 4.

Furthermore, drug overdoses deaths involving cocaine were higher in the Northeast region of the United States than they were anywhere else in the country.[26]  In 2018, there were 8.5 deaths per 100,000 in urban areas, and 5.4 deaths per 100,000 in rural areas.[27]  While nearly all rural areas are markedly lower than urban areas, the Northeast's rural deaths are almost as high as the Midwest's (the second-highest region) urban areas.



Therefore, as part of its effort to promote safety generally and reduce the risks of drug abuse specifically, the government has a particularly strong interest in regulating cocaine distribution in this part of the country.  More to the point, it is in the public's interest to reduce the number of overdoses that plague our communities.  In particular, Massachusetts ranks within the

---

[26] Hedegaard, et al., *supra* note 15, at 5.
[27] Hedegaard, et al., *supra* note 15, at 5.

top ten states for drug overdose mortality,[28] and powdered cocaine accounts for the second-most trafficked drug today.[29]

KALLON, through his connection with K. DRAYTON, put the residents of the Commonwealth at risk. KALLON did not just purchase small quantities for either individual consumption or singular distribution. As the record indicates, KALLON was a "wholesale" purchaser of large quantities of cocaine from K. DRAYTON. PSR ¶ 10. On at least three separate occasions, KALLON purchased approximately 62 grams of cocaine for redistribution, likely to other members of his Mattapan neighborhood. PSR ¶ 10, 20, 34. As a result, KALLON promoted drug abuse and put other lives at risk.

### B. Characteristics of the Defendant

KALLON, to his credit, has several accomplishments in his life so far. He had a stable upbringing by two parents and several siblings, although his family struggled financially. PSR ¶ 56-66. He also is a father of two children, each of whom he sees regularly, despite the children living in different parts of the Commonwealth with their respective mothers. PSR ¶ 68-71.

KALLON also has a good education, with a high school diploma and additional post-graduate and vocational studies. He was an AP Government student in high school (and met President Obama). PSR ¶ 57. KALLON received his diploma from TechBoston Academy in 2012. PSR ¶ 84. He then participated in the City of Boston's Year-Up.org program from 2012 through 2013, where he took "six months of IT classes and completed a six-month internship to

---

[28] *Drug Overdose Morality by State*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm.

[29] *Quick Facts: Drug Trafficking Offenses*, UNITED STATES SENTENCING COMMISSION (June 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Drug_Trafficking_FY19.pdf.

graduate from the program." PSR ¶ 84. He then studied criminal justice at Bunker Hill Community College from 2013 through 2015, but left before completing his degree. PSR ¶ 84. These skills will serve him well in his rehabilitation following a term of imprisonment.

KALLON also reports a history of alcohol and marijuana abuse, which may have arisen in response to mental and emotional health concerns. He reports first consuming alcohol at the age of 9. PSR ¶¶ 78, 80. His alcohol usage continued to excess, where, from the ages eighteen to twenty-five, "he consumed alcohol daily to the point of intoxication, drinking full bottles of Hennessy, Jack Daniels, Bacardi, and Patron." PSR ¶ 80. This consumption has tapered off, and he reports that he now "presently consumes alcohol four days a week." PSR ¶ 80. As for his marijuana usage, from the ages of eighteen to twenty-five, KALLON "used marijuana daily to help him relax." PSR ¶ 81. On the other hand, it did cause problems for him. "He used it throughout the day, drove while smoking, and had strong cravings to use it. His use caused arguments with his brother." PSR ¶ 81. KALLON stopped using after his arrest. PSR ¶ 81. KALLON has expressed an interest in participating in the Bureau of Prisons' 500-Hour Residential Drug Abuse Program (RDAP), and he "believes that it may be helpful." PSR ¶ 83. KALLON also appears to qualify for this program based on his difficulties with substance abuse. PSR ¶ 83. The government supports KALLON's request for RDAP.

KALLON has had periods of employment, which speaks to his ability to hold a job. PSR ¶ 86-94. However, KALLON has been unemployed since March 2020, which overlaps with the period when he was engaged in the conspiracy. PSR ¶ 86. In the future, KALLON hopes to begin working in the construction field. PSR ¶ 86. Vocational training and full time employment are appropriate for KALLON.

KALLON is a young man responsible for trafficking hundreds of grams of cocaine. A term of 24 months in prison is necessary to punish him for that crime and deter future criminal activity. At the same time, this modest sentence will permit KALLON to return to community successfully at the completion of his term.

### C. Conditions of Supervised Release

The government requests a term of 36 months of supervised release, which is the statutory mandatory minimum. The government also asks that the Court impose the Special Conditions set forth at pp. 25-26. The government in particular joins Probation's request for substance abuse and mental health treatment, as well as vocational training (which KALLON also expressed an interest in). Working full time, which the defendant is now able to do, will give the defendant direction and provide fulfillment.

## IV. THE GOVERNMENT'S RECOMMENDATION

For the foregoing reasons, those contained in the PSR and those to be presented at the sentencing hearing, the government requests the following sentence:

- a term of 24 months' imprisonment;
- no fine, because it appears that KALLON cannot pay a fine;
- a term of 36 months' supervised release with the conditions discussed above; and
- a special assessment of $100.

Respectfully submitted,

ANDREW E. LELLING
UNITED STATES ATTORNEY

By:  s/ Timothy E. Moran
TIMOTHY E. MORAN
KAITLIN O'DONNELL
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                            s/ Timothy E. Moran
                                            TIMOTHY E. MORAN

Date: February 23, 2021